## BUSCH & LATTA PAINTING COMPANY v. WOERMANN CONSTRUCTION COMPANY, Appellant.

### Division Two, October 6, 1925.

1. **PLEADING**: Legal Liability: Legal Conclusion. A petition which, after alleging the injury to two of plaintiff's painters and the settlement of suits brought by them, alleges that, by reason of the collapse of the scaffold constructed by defendant, plaintiff's said employees were injured, and that thereby the plaintiff became "legally liable" to pay the damages incurred, in consequence of which the payments were made, is not demurrable on the ground that the allegation is a mere legal conclusion, where it sets out all the facts regarding the unsafe scaffold and showing legal liability of plaintiff to its employees, because of its failure to exercise care to furnish a safe place for them to work. And particularly so, where it was stipulated in a separate written contract that defendant could not deny plaintiff's liability to the injured employees on the very facts stated in the petition.

2. **IMPLIED WARRANTY**: Construction of Scaffold: Special Purpose: Indemnity. Where an article for a special purpose is ordered of a manufacturer, if it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose, and a cause of action arises in favor of the purchaser if it proves unfit. So that where the plaintiff had a contract to paint the ceiling of a very large room, which was seventy feet high, with a balcony about three feet wide encircling the room thirty feet from the floor, and being confronted with the problem of how to construct a scaffold upon which his employees could stand while doing the painting, applied to defendant construction company, engaged in constructing scaffolds, to build a scaffold that would answer the purpose of the painters, and the defendant agreed and undertook to construct

a scaffold that would be suitable and safe for the painters' uses, assuring plaintiff, through its engineer, that such a scaffold could be constructed according to the engineer's plans, to whose judgment the plaintiff trusted, and when constructed the scaffold proved unsafe, and in consequence the painters, while in line of their duty, were injured when the scaffold gave way under their weight, the plaintiff, having compensated them for their injuries, is entitled to be reimbursed by defendant.

3. ———: Written Contract: Preceding Conversations. Plaintiff, having a contract to paint the ceiling of a very large and very high room, was confronted with the problem of how to construct a scaffold upon which its painters could stand while doing the painting, and its president applied to defendant construction company to construct the scaffold, and was shown a sketch by defendant's engineer, who the next day wrote plaintiff that "as per our verbal agreement we will furnish all labor and material for building and wrecking a trussel scaffold as per our plans, to be used by you in painting the ceiling of the main room of the above building, for the price of $845." Held, that the letter does not purport to contain all the contract, and it was therefore competent for plaintiff's president to testify: (a) that he and the engineer had already made their contract before the letter was written; (b) that the particular plan agreed upon was not a selection, but the only plan presented by the engineer as suitable for the purpose; and (c) that he knew nothing about the capacities and strains of scaffolding necessary for the purpose, and trusted to the defendant to construct a proper scaffold.

4. SCAFFOLD: Defective Construction: Nails. The evidence in this case was sufficient to show that the scaffolding was put together with nails; that nails were not suited for the purposes; that bolts could have been used and would have insured safety, and these facts are held to have been sufficiently substantial to support a verdict that the scaffold was defectively constructed.

5. INDEMNIFICATION: Joint Tortfeasors: In Pari Delicto: Assurances of Safety. Where one party creates the condition which causes an injury to another's employees, and such other does not join therein, but is exposed to liability and suffers damages on account of it, the rule that one of two joint tortfeasors cannot maintain an action against the other for indemnity does not apply. If the parties are not in pari delicto, the party whose negligent acts were the proximate cause of the injury to the other's employees must indemnify such other for the losses he has sustained in compensating his employees for their injuries. Where defendant manufactured and sold to plaintiff a scaffold for a

definite purpose, namely, for the use of plaintiff's painters in painting a very high ceiling in a very large room, there was an implied warranty on the part of defendant that the scaffold was suitable for that purpose; and where plaintiff, being without knowledge of the proper manner of constructing such scaffolds, relied upon the expert knowledge of defendant to furnish a scaffold suitable for the purpose, and the scaffold furnished by defendant proved unsafe and defectively constructed, the parties, though joint tortfeasors, were not *in pari delicto*, and the defendant is primarily liable for injuries to plaintiff's employees caused by defects in the scaffold. And the fact that plaintiff, in so far as his employees were concerned, was not justified in relying upon the skill and good faith of defendant, does not neutralize the fact that defendant invited that reliance by furnishing a structure which in effect defendant assured plaintiff would answer the purpose.

6. ————: ————: ————: ————: **Scaffold: Statute.** The statute requiring all scaffolds to be so secure as "to insure the safety of persons working thereon," and making a failure to comply therewith a misdemeanor, applies to the party whose employees use a scaffold in painting a very high ceiling and to the party who furnishes the scaffold for such uses, but it does not put them *in pari delicto* because of its defective and unsafe construction, but so far as their relations to each other are concerned leaves them in the same relation they would be if there were no such statute. The defendant, being an expert manufacturer of scaffolds and undertaking to manufacture for plaintiff a scaffold which it warranted would be suitable for such uses, violated the statute when it undertook, with its scientific and expert knowledge, to comply with it, and instead furnished a defectively constructed scaffold; and the plaintiff, being ignorant of what was necessary, but in good faith thinking the statute was being complied with and trusting to the assurances of defendant to meet its requirements, was not in equal wrong with defendant, but is entitled, though the duty rested upon him to inspect the scaffold before or at the time his employees used it in their work, to be reimbursed by defendant for losses he sustained for injuries to them caused by defects in the scaffold.

7. **INSTRUCTION: Scaffold: Construction According to Plans.** Plaintiff's acceptance of plans for the construction of a scaffold presented to him by defendant at the time he contracted for the scaffold, did not conclude him as receiving what he bargained for, unless he understood what the drawings meant, or unless he understood the quality of the thing represented by the drawings.

8. **EVIDENCE: Expert Testimony: Invasion of Province of Jury.** It is not an invasion of the province of the jury to determine the

Busch & Latta Painting Co. v. Woermann Construction Co.

ultimate fact whether the scaffold was safe for the uses to which it was put, to permit a civil engineer and building superintendent, engaged in such business for more than twenty years, to testify that in his opinion the scaffold, as constructed and fastened together with nails, was not reasonably safe for the purpose for which it was built. The jury, in reaching the ultimate fact whether the scaffold was defectively constructed, are entitled to the aid of expert testimony in matters which require expert knowledge and expert exposition; and when an expert testifies that in his opinion a certain cause produced a certain result, his testimony is like any other fact of which the jury has evidence, and which they may believe or disbelieve.

9. **EXCESSIVE DAMAGES: Money Paid to Injured Employee by Insurance Company: Subrogation.** In an action by plaintiff for reimbursement for the amount of money paid to its employees for injuries caused by defects in the scaffold furnished plaintiff by defendant under an implied warranty that it was safe for their use, the defendant is not entitled to have the amount so paid reduced by money paid to such employees by an insurance company upon policies insuring plaintiff against any such losses plaintiff might incur. The insurance company is obliged to pay plaintiff any losses plaintiff incurred, and having paid them is entitled to be subrogated *pro tanto* to the right of action which the insured employee had against the defendant whose wrongful act caused the loss, but the suit to recover the loss must be brought in the name of the plaintiff.

10. ———: **Attorney's Fees: Remittitur.** Although the instruction improperly authorized the jury to allow plaintiff the amount of attorney's fees paid for services rendered in defense of suits brought against plaintiff by employees to recover damages for their injuries, the judgment for damages to which the evidence clearly establishes that plaintiff is entitled to recover will be affirmed for such definite amount if the plaintiff will remit the excess.

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., Section 2632, p. 717, n. 21. Evidence, 22 C. J., Section 757, p. 657, n. 57; p. 658, n. 67; Section 1715, p. 1287, n. 72. Indemnity, 31 C. J., Section 27, p. 432, n. 19; Section 47, p. 447, n. 88; Section 55, p. 455, n. 69, 70; Section 57, p. 457, n. 98; Section 66, p. 466, n. 95; Section 72, p. 470, n. 59. Insurance, 33 C. J., Section 714, p. 43, n. 42. Pleading, 31 Cyc. p. 272, n. 16. Sales, 35 Cyc. p. 399, n. 37. Trial, 38 Cyc., p. 1618, n. 36.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

AFFIRMED (*upon condition*).

*Eilers & Schaumberg* and *Holland, Rutledge & Lashly* for appellant.

(1) The court erred in overruling the demurrer filed by appellant to the petition. (a) If the action sounds in contract and is brought on the theory of an implied warranty, the petition stated no cause of action, because there is no averment of an implied warranty or of a breach of same. (b) If the action sounds in tort, and is based upon the principle of indemnity, the petition does not state a cause of action, because it contains no valid allegation of facts showing that respondent was legally liable to third persons to whom it paid or claims to have paid money and thus sustained a loss. The averment of the petition that respondent became "legally liable" is a mere averment of a conclusion and is to be disregarded. Mallinckrodt v. Nemnich, 169 Mo. 388; Geninazza v. Leonori, 252 S. W. 419; State v. Lee, 233 S. W. 20; Maniaci v. Express Co., 266 Mo. 633; Lappin v. Nichols, 263 Mo. 285; Benjamin v. Railroad, 245 Mo. 598; Harrington v. Dunham, 202 S. W. 1069. (c) If the action sounds in tort and is based upon the principle of indemnity, it states no cause of action, because it appears from the allegations of the petition that under Sec. 6802, R. S. 1919, respondent was under an absolute duty to see to it that the scaffold in question was so built as to insure the safety of its employees. And under Section 6806, respondent, in failing to do so, was guilty of a misdemeanor. And said obligation so placed upon the respondent by said Section 6802 was not placed upon the appellant. Glaser v. Rothschild, 221 Mo. 180. Respondent was primarily liable to its employees injured by the collapse of the scaffold, and is, therefore, not entitled to indemnity. Washington Gas Co. v. District of Columbia, 161 U. S. 316; 40 Law Ed. 712. (2) The court erred in refusing to give the peremptory instruction asked by appellant at the close of all the evidence, because it appears from the testimony of respondent that the respondent did not contract with the ap-

pellant to furnish a scaffold that should be reasonably fit for the use of respondent and rely upon appellant; but, on the contrary, contracted for the erection of a scaffold in accordance with definite plans and specifications; and, in fact, such a scaffold was erected. The law is that where a vendor contracts to furnish a definite and specific sort of an appliance to a vendee, and does so, there is no emplied warranty of its fitness for uses to which the vendee intends to put it, even though such purposes be known to the vendor. Mark v. Cooperage Co., 204 Mo. 242; Seitz v. Refrigerating Co., 141 U. S. 510, 35 L. Ed. 837; Benjamin on Sales, sec. 657; Chanter v. Hopkins, Mess. & W. 390; District of Columbia v. Clephane, 110 U. S. 212; Kellogg Bridge Co. v. Hamilton, 110 U. S. 108; Pullman Car Co. v. Met. St. Ry. Co., 157 U. S. 94; Lindsborg Mill. Co. v. Danzero, 189 Mo. App. 154; Grand Ave. Hotel v. Wharton, 79 Fed. 43; Morris v. Fertilizer Co., 64 Fed. 56; Cunningham v. Hall, 4 Allen (Mass.) 268; Studor v. Bleistein, 115 N. Y. 312. It is particularly so where the alleged defects in the appliance so delivered to the vendee are open and obvious or easily discoverable by him upon delivery. There is no implied warranty in such case. Studor v. Bleistein, 115 N. Y. 312; June & Co. v. Falkenburg, 89 Mo. App. 563; Thompson v. Botts, 8 Mo. 710; Muhr v. Eagle, 7 Mo. App. 590; Sinnamon v. Moore, 161 Mo. App. 168; Doyle v. Parish, 110 Mo. App. 470. The contract involved herein was in writing. It clearly states that appellant was to erect for the respondent a scaffold in accordance with certain definite plans or terms, and this contract could not be enlarged by any testimony of preceding conversations; such testimony was incompetent and when introduced is to be ignored. Northern Assur. Co. v. Bldg. Assn., 183 U. S. 308; Koons v. St. Louis Car Co., 203 Mo. 255; Boyd v. Paul, 125 Mo. 13; Farmers State Bank v. Sloop, 200 S. W. 304; Union Selling Co. v. Jones, 128 Fed. 672; McKinley v. Williams, 74 Fed. 94; Green v. Chicago Ry. Co., 92 Fed. 873. (3) There is no testimony in the case that the scaffold was

unfit for the uses to which plaintiff intended to put it on account of the supposed defects averred in respondent's petition, to-wit, that the timbers were fastened with nails. The respondent having specified that the scaffold was unsafe merely on account of the use of nails was limited to this averment, and respondent could in no way recover unless he proved that the scaffold was insufficient for said reason. It appeared from the testimony of respondent's witness (Detjen), that the scaffold, when completed, was sound and solid and suitable structure for the work to be done, and in particular that the nails used were suitable for the purpose. Testimony of respondent's expert, Paffrath, to the effect that the scaffold, as built, was not "reasonably safe" was incompetent, because it invaded the province of the jury and is to be excluded, and should be disregarded. Urbank v. City of Edina, 88 Mo. 650; Koons v. Railroad, 65 Mo. 592; Boettger v. Iron Co., 136 Mo. 531; Gutridge v. Mo. Pac. Ry. Co., 94 Mo. 469; Langston v. Railroad, 147 Mo. 457; Mitchell v. Violette, 203 S. W. 218; Castanie v. Railroad, 249 Mo. 192; Taylor v. Railroad, 185 Mo. 249-292; Roscoe v. St. Ry. Co., 202 Mo. 576. (4) The instruction dealing with the measure of damages was erroneous. It states that "the plaintiff should be awarded $6,500, the amount which it is conceded that plaintiff paid in the settlement made with Karl and Ellrich." This was erroneous because there is no evidence to that effect. On the contrary, the evidence was directly opposite. The testimony of fact showed that respondent paid out only $500 to Ellrich and nothing to Karl. (a) The said instruction is further erroneous in that it allowed a recovery of $979 for damaged property of the Merchants Exchange. As to this matter there was no non-waiver agreement entered into between the parties. Even if respondent had any right of recovery at all, which we deny, it would be a prerequisite that he introduce testimony to the effect that the respondent committed an act that constituted negligence on its part towards said Merchants Exchange and a further pre-

requisite that the jury so find.  (b)  It is further er-
roneous because it allows recovery for such reasonable
sums as respondent expended for counsel fees in the
Karl and Ellrich cases, and there is no testimony as to
what services were rendered in such case and what would
be reasonable fees.  The law is well settled it is er-
roneous to allow a recovery of certain matters where
there is no evidence upon which to predicate the same.
And as to counsel fees in the Karl Case, a recovery
could not be allowed under any conditions, because in
the Karl Case the appellant was not called upon to de-
fend the same.

*Jones, Hocker, Sullivan & Angert* for respondent.

(1)  If the defendant was negligent in the con-
struction of the scaffold, it was obliged to indemnify the
plaintiff against liability therefor.  31 C. J. 447, 453;
Tel. Co. v. St. Louis, 268 Mo. 497; Ins. Co. v. Engineer-
ing Co., 184 Fed. 431; Wannamaker v. Elevator Co., 228
N. Y. 192; Rubber Co. v. Kendall, 178 Mass. 232; Gas
Co. v. Columbia, 161 U. S. 327.  (2)  Defendant's letter
was not a contract.  Allen v. Chouteau, 102 Mo. 309;
Green v. Cole, 103 Mo. 70; Sanders v. Fruit Co., 144 N.
Y. 209; Am. & Eng. Ann. Cases, 1912B, p. 130, note.
(3)  The plaintiff was the proper party to bring the
action and was entitled to recover sums paid by itself
and by the insurance company in its behalf, in discharge
of its obligation.  14 R. C. L. sec. 568, p. 1404, sec. 574,
p. 1410; Ins. Co. v. Ry. Co., 74 Mo. App. 106; Swift v.
Railroad, 149 Mo. App. 529; Ins. Co. v. Oil Co., 59 Fed.
987; Ins. Co. v. Engineering Co., 184 Fed. 426.  (4)  The
plaintiff was liable to the Exchange for its property loss,
occasioned by defendant's negligence.  Bissell v. Boden,
34 Mo. 65; Galbraith v. Steel Co., 133 Fed. 485.  (5)  It
is no objection to expert testimony that it deals with
the ultimate question which the jury must decide.  Kirch-
low v. Ry. Co., 264 S. W. 416; O'Leary v. Steel Co., 260
S. W. 55; 11 R. C. L. pp. 572, 583.  (6)  Whether this

structure was safely built, if joined with nails, was a proper subject for expert testimony. 11 R. C. L. p. 631; 22 C. J. p. 650, par. 743, and note; Combs v. Construction Co., 205 Mo. 392.

WHITE, J.—This suit is for indemnity. The plaintiff/employed the defendant to construct a scaffold for the use of the plaintiff's employees. The scaffold collapsed and injured two of said employees; plaintiff paid their claims for damages, sued the defendant for the amount so paid, and recovered judgment, October 11, 1922, for $7879. The defendant appealed.

The plaintiff, a corporation, engaged in the painting business, had a contract to clean and paint the ceiling of the Merchants Exchange Building, in St. Louis. The room was 210 feet long, 90 feet wide, and about 70 feet from the floor to the ceiling. A balcony encircled the room about thirty feet from the floor. This balcony was between $2\frac{1}{2}$ and $3\frac{1}{2}$ feet wide. The plaintiff was confronted with the problem of how to construct a scaffold by means of which the ceiling could be cleaned and painted. The president of the plaintiff, Mr. Latta, consulted with the manager of the defendant, Mr. Martin, for the purpose of having a scaffold erected which would answer that purpose; building of scaffolds was in the line of the defendant's business. It was necessary to make a scafford which would span the space the short way of the room from balcony to balcony. Mr. Latta suggested that movable towers should be built from the floor of the building, so that a scaffold resting upon them and upon the balcony at the sides could be moved as the work progressed. Mr. Martin said that was not practicable, and the conference resulted in an arrangement whereby defendant constructed a scaffold. It was about twelve feet wide and extended clear across the building from side to side, more than eighty feet. At each end of the scaffold were uprights, built upon two by tens, which lay upon rollers, called dollies; from these uprights "trus-

ses'' extended across the room from balcony to balcony, and upon these the bracing and frame work of the scaffold was built high enough so that upon a platform at the top the painters could stand and reach the ceiling. This scaffold was placed at one end of the building, the purpose being that when work above the scaffold had been finished, it could by means of the rollers be moved along the balcony and the work begun in a new place.

The first day the men employed by plaintiff worked on the scaffold, and before they quit at night they moved it by ''pinching'' it along, one man at each end using a crowbar. The next morning the men moved the scaffold a little further and then mounted it to go on with their work. In a short time it collapsed, precipitating to the floor two of the painters, plaintiff's emloyees, William Ellrich and Henry Karl. Both men were severely injured and brought suit in the Circuit Court of the City of St. Louis against the plaintiff and the defendant for damages. Before these cases came to trial the plaintiff and defendant effected a settlement with the men. By that settlement Karl was paid $2,000, and Ellrich was paid $12,000. It is alleged in plaintiff's petition that the defendant paid $1,000 of the amount paid Karl, and $6500 of the amount paid to Ellrich, and that the plaintiff paid $1,000 of the amount paid Karl, and $5500 of the amount paid Ellrich. Plaintiff also paid the $979 to the Merchants Exchange for damage done to the building when the scaffold collapsed, and also paid $475 for legal services, and $54.35 court costs in the Ellrich case It also paid $150 for legal services in the Karl case, and $40 for depositions and commissioner's fees and medical services in connection with the Karl case. The suit is for $5500 paid Ellrich, $1000 paid Karl, and the other items mentioned, totaling $8208.35, demanded in the petition, while the verdict returned and the judgment were for $7879.

After the settlement with Ellrich and Karl the plaintiff and defendant entered into a contract in regard to each case. After reciting the payments, etc., the agree-

ment in regard to the Karl case provides that neither party by such payment will "be prejudiced in reference to any claim that either has or may have against the other in the premises." It then provides that each shall pay one thousand dollars towards the settlement of Karl, and that the sum is a reasonable compensation for his injuries; that by contributing the sum mentioned neither party admits that the collapse of the scaffold was due to its negligence. The contract then contains the following stipulation:

"(d) It is agreed, however, between the parties, that in any case party of the first part shall hereafter make claim against party of the second part to recover the amount so contributed by the former toward the settlement of said suit of Henry Karl, the party of the second part shall be estopped to deny the right of said Henry Karl to recover in said suit against the party of the first part."

The party of the first part mentioned is the plaintiff here, and the party of the second part is the defendant here. It is then provided that the party of the first part by contributing that sum did not waive any right it might have to recover from the party of the second part the amount contributed in the settlement, and that the party of the second part by contributing to the settlement did not waive any right to recover from the party of the first part the amount contributed. The same stipulations were made in the contract regarding the settlement of the Ellrich claim where it was recited that the party of the first part contributed the sum of $5500, and the party of the second part $6500 in settlement.

The petition alleged, and the evidence offered by plaintiff tends to prove, that the collapse of the scaffold was due to the timbers which composed it being fastended together with nails instead of with bolts; that the expanse of more than eighty feet spanned by those timbers and braces was too great for the weight of the scaffold and its load, and the nails pulled out. The scaf-

fold afterwards was rebuilt with bolts instead of nails, and then was used successfully without further trouble. The plaintiff offered expert evidence tending to show that the scaffold, as · constructed, was not reasonably safe.

The defendant offered evidence to show that the scaffold was not properly moved, but was moved in a way to cause the nails to become insecure by putting an unnecessary strain upon them. It was shown that in pinching the scaffold along on the rollers, one end got as much as a foot ahead of the other end. Defendant claims this weakened the structure. The end which was behind was properly moved up before the men mounted the scaffold. It was further shown that heavy wires depended from the ceiling towards the floor of the building, upon which chandeliers had been hung; that in moving the scaffold the flooring upon which the men stood came in contact with one of those hanging wires which somehow got fastened in the edge of the platform and attracted the attention of the men by a ''click'' or noise it made. One of the men kicked it loose and dropped it down on the other side of the scaffold so that it gave no further trouble. The evidence is not clear as to just what effect contact of that wire with the scaffold had. At the instance of the defendant the jury were instructed if they found that the plaintiff, in moving the scaffold, did not move the two sides of it uniformly and simultaneously, but moved one side ahead of the other, and in so doing subjected the scaffold to an unusual and unnecessary strain, and failed to exercise ordinary care in that respect, and that such conduct directly caused and contributed to cause collapse of the scaffold, the verdict should be for the defendant. Evidence also was offered by defendant that its engineer had told the plaintiff that the proper way to move the scaffold was by the use of chain blocks. The jury were instructed that if they found such to be the fact, and that the failure to use chain blocks contributed to the collapse of the scaffold, the verdict should be for the defendant.

The instructions for the plaintiff were predicated upon the allegations of the petition, as stated. Complaint is made of instructions given for the plaintiff, and the refusal of instructions offered by defendant. The questions arising on account of these come in a general way under the several points made by the appellant affecting the plaintiff's right to recover on the pleadings and the facts in evidence.

I. The defendant filed a demurrer to the plaintiff's petition, which was overruled; also filed a motion to make the petition more definite and certain, which was also overruled. One point made in the demurrer is the same as that covered by the motion; the petition, after alleging the injury to the two men and the settlements of the suits brought by them, alleges that by reason of the collapse of the scaffold and the injury, the plaintiff became "legally liable" to pay the damages incurred, in consequence of which the payment was made. The point is that this is a mere legal conclusion, and there is no averment of fact showing such liability.

The petition sets out all the facts regarding the alleged unsafe scaffold, upon which plaintiff had put its men to work, showing neglect of its non-delegable duty to exercise care in furnishing a safe place for them to work. If a case was otherwise stated against defendant, the petition alleged facts showing legal liability of plaintiff to its employees, because of its failure to exercise care to furnish a safe place. Besides it was stipulated between the parties to this suit, as mentioned above, that defendant could not deny plaintiff's liability to the injured employees on the very facts stated in the petition.

The demurrer was a general one, and goes of course to the sufficiency of the allegation in the respect mentioned; also to the right of the plaintiff to recover for indemnity against the defendant. The latter question will be considered below.

II. The defendant offered a demurrer to the evidence and assigns error to the action of the trial court in overruling it. It is argued that this was not a case where the defendant was employed to build a structure suitable for the purpose for which it was intended, but that plaintiff employed the defendant to erect a definite kind of a scaffold, constructed in every particular as the plaintiff wanted it. The parties entered into a contract where the entire matter of determining the style of the scaffold was not left to defendant, but it was erected in strict accordance with the details which the plaintiff selected; therefore there was no liability because there could be no implied warranty in a specific thing contracted for.

*Implied Warranty: Indemnity.*

Mr. Latta, representing plaintiff, testified to what was said and done in reference to making the arrangements, as follows:

"Q. Where did you go? A. Down to the exchange room and up to the balcony. And I had in mind building a couple of towers in the center of the room that would be movable and that would extend to the balcony on either side; and I thought that would be the way to do it, and he (Mr. Martin) said that wouldn't be practicable.

"Q. *Did you know anything about scaffolds of that kind? A. No sir.*"

And further in explanation:

"Mr. Reeder (continuing examination): Q. All right; you and Mr. Martin went down there to the Merchants Exchange Building, I believe you have stated? A. I says, *'Can it be done?'* And he says; 'Why not?' and I says: *'I don't know, you are the engineer.'* 'And, well, all right,' he said, *'it can be done.'* And he said: 'I'll go back to the office and get up a sketch.' Which he did. And I came in there the next day—I don't remember the hour, but before noon—and it was on the drawing board, and he asked me to look at it. And I says: 'As far as I can see, it looks all right to me, *but I know nothing about the carrying capacities and strains.'* And

he named a price and I told him to get busy and get it up as soon as he could, and which they did. And he then started in,—''

Mr. Martin submitted to the plaintiff drawings showing the plan of the scaffold. Mr. Latta said he looked them over and asked Mr. Martin what it would cost to put them up. Mr. Martin named the price, and the next day, September 4, 1919, wrote the plaintiff a letter, as follows:

"PLAINTIFF'S EXHIBIT NO. 1.
"Woermann Construction Company,
"Suite 543 Century Building,

"St. Louis.
"September 4, 1919.

"Re: Stock Exchange Building.
"Busch-Latta Painting Co.,
    "4366 Finney Ave.,
    "St. Louis, Mo.
"Gentlemen:
    "As per verbal agreement of the 3rd inst., we will furnish all labor and material for building and wrecking a trussel scaffold as per our plans, to be used by you in painting the ceiling of the main room of the above building for a price of eight hundred forty-five dollars.
    "We have ordered our lumber and will have men at building to begin construction Friday morning, September 5th.
                                    Yours truly,
            "WOERMANN CONSTRUCTION COMPANY,
                    "CHAS. W. MARTIN, Sec'y.,
                            CHARLES W. MARTIN."

In the cross-examination of Latta about what he said:

"Q. Or he stated what he would do? A. He gave me a verbal bid.

"Q. I have already talked about that—I mean the next day. A. He confirmed it in writing.

"Q. You received from him this letter embodying the verbal bid in writing? A. *Yes, sir, I had already given him a contract before this was written.*

"Q. But this expresses in writing the meeting of minds that you all had the day before? A. Yes, sir; that is the idea; that is right.

"Q. You never complained that this was different from your verbal arrangement? A. No, sir.

310 Mo. Sup.—28.

"Q. And you accepted this and they acted on this and you acted on this? A. *No, sir, I just filed the copy away.*

"Q. You didn't object to it? A. No, sir.

"Q. This was in accordance with *and embodied the verbal meeting of minds that you had the day before with Mr. Martin, isn't that correct?* A. Yes, sir."

The general rule is that where an article for a special purpose is ordered of a manufacturer, if it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose, and a cause of action arises in favor of the purchaser if it proves unfit. [24 R. C. L. 192.] The Springfield Court of Appeals in the case of Lindsborg M. & E. Co. v. Danzero, 189 Mo. App. l. c. 161, used this language in respect to that principle:

"If the facts and circumstances disclose that the seller contracts to supply the thing for a particular purpose, the buyer, trusting to the judgment of the seller, then the implied warranty arises that it shall be reasonably fit for that purpose."

In the case of Hunter v. Waterloo Gasoline Engine Co., 260 S. W. l. c. 972, this court quoted the above passage from the Danzero Case and cited many cases in support of the proposition, stating again the general rule that liability accrues where the seller contracts to furnish an article for a particular purpose, the buyer trusting to the judgment of the seller that the article is suitable for that particular purpose. In the present case the defendants were engaged in the business of erecting scaffolds; had engineers skilled in that particular work. Mr. Latta in his testimony stated that he had built many scaffolds for the purpose of painting, but never one of the character required here. Mr. Martin rejected his suggestion about supporting towers. In response to Latta's expression regarding his own ignorance and his dependence upon Martin, because "you are the engineer;" Martin said "It can be done." Afterwards Martin produced his sketch, and Latta again ex-

pressed his lack of confidence in his own judgment: "I know nothing about the carrying capacities and strains." Thus he apprised Mr. Martin that he trusted to Mr. Martin's judgment as to what was necessary and what would be safe for the purpose. If the jury believed Latta's testimony they properly could draw these conclusions: Martin knew the purpose for which the scaffold was to be constructed; he undertook to construct a scaffold suitable for that purpose. Latta accepted the sketch of the plan which Martin produced, because it was in accordance with Martin's judgment. While Latta got the definite article that the contract called for, according to the plans which he saw and approved, he didn't make the plans, he didn't suggest them; it was not a matter of selection; he took the plans which Martin tendered him with the understanding that Martin knew his business and knew that the structure, in accordance with the plan, would meet the purpose for which they were designed.

Appellant claims that these conversations between Latta and Martin were not admissible in evidence because the letter of September 4, 1919, was a written contract into which these prior negotiations were finally merged. This contention is unsound because the letter does not purport to contain all the contract. Latta testified that they had already made their agreement before the letter was written, and the letter shows it, because it begins: "As per verbal agreement of the 3rd instant." Even if the letter and the plans did constitute the entire contract, it was entirely competent for the plaintiff to prove the circumstances under which the contract was entered so as to show whether Mr. Latta trusted to his own judgment, or that of Mr. Martin, as to the sufficiency of the proposed scaffold. The letter has nothing to say about how the plans were selected or who proposed them. It was proper for the plaintiff to show how he came to take that particular plan for the scaffold; to show in fact that it was not a selection at all, but it was the only plan

*Oral Evidence.*

presented by Mr. Martin as suitable for the purpose; that Mr. Latta did not know anything about the capacities and strains of the scaffolding necessary for the purpose, and that he trusted to the defendant to produce a proper one for the purpose. It is not a modification of a contract to show the situation of the parties and the reasons for entering it. The evidence was competent.

III. It is further claimed that a case was not made out and a peremptory instruction for the defendant should have been given, because there was a failure on the part of the plaintiff to prove that the scaffold was **Nails.** unfit for the purpose for which it was intended, by reason of the defects alleged in the petition. It is argued that there is no proof that the use of nails as alleged was the cause of the collapse.

Of course those who saw the scaffold fall did not see the nails pull out, but after it had fallen it was shown that the nails had pulled out—pulled through the wood. The collapse of the scaffold, as testified by the witnesses, was not caused by the breaking of the timbers composing it, but it "buckled up" and collapsed. It could have fallen only by reason of toppling to one side, or because of the breaking of the timbers, or by the giving way of the fastenings by which the timbers were spliced together. The manner in which it fell, and the condition of the timbers afterwards, showed that only the loosening of the fastenings could account for the fall. Some of the nails used were double-headed, having a sort of shoulder near the head of the nail which would prevent it going clear in, leaving it so that it could easily be pulled out. Such nails were used as a matter of economy on the part of the defendant. It was further shown that the scaffold in the same shape was put together with bolts instead of nails, and thereafter used safely. So we think the evidence was sufficient from which a jury could find as a fact that it was the use of nails which caused the scaffold to collapse. In finding for the plaintiff they also must have found that it was not the method by which it

was moved which caused the nails to pull out and the scaffold to be weakened.

IV.  It is further claimed that a peremptory instruction should have been given because there was no liability on the part of the defendant to indemnify the plaintiff for the money paid out in settlement of the claims for damages which accrued on account of the collapse of the scaffold.

Indemnification: Joint Tortfeasors.

Appellant concedes the general rule that where one person has been exposed to liability and compelled to pay damages on account of the negligence of another, the first has a right of action against the other for indemnity, but claims that the rule does not apply here because the plaintiff and the defendant were joint tortfeasors, and the rule does not allow one joint tortfeasor to recover indemnity against another.  The extent of the application of the rule is ably discussed by STURGIS, J., of the Springfield Court of Appeals, in the case of City of Springfield v. Clement, 205 Mo. App. l. c. 118, 119.  That is a case where the city of Springfield was compelled to pay damages for injury to a person, caused by a defective sidewalk, and the city was allowed to recover against the owner of the property who permitted the sidewalk to become defective.  The judgment in favor of the city was affirmed; the case later was certified to this court and reversed on account of defect of parties, but the opinion of Judge STURGIS upon the principles mentioned was not disapproved.  The limit of the rule may thus be stated: the right to indemnity in such cases is confined to cases where the parties are not *in pari delicto*.  In all cases where one party creates the condition which causes the injury, and the other does not join therein but is exposed to liability and suffers damages on account of it, the rule that one of two joint tortfeasors cannot maintain an action against the other for indemnity, does not apply.  [22 Cyc. 99; 31 C. J. 447.] The Supreme Court of Massachusetts in the case of

Boston Woven Hose Co. v. Kendall, 178 Mass. 232, had under consideration a case similar to this; the opinion was written by HOLMES, C. J., later Judge of the United States Supreme Court. Judge HOLMES thus expressed the principle, at page 236:

"The case is treated by the defendants' counsel as if it stood on the same footing as one where a plaintiff seeks to recover for personal injuries to himself to which his own negligence has contributed. But the judge allowed the plaintiff to recover a verdict on proving as it did to the satisfaction of the jury that it was liable for the damages which it paid, and also that although negligent as towards its servants *it had shown all the care which the defendants had a right to expect.*"

And further:

"The plaintiff's misconduct consisted in a failure to discover by inspection a defect in an article specially made for it and probably not falling within the exceptional rule as to well known articles made by reputable makers and sold in the market ready for use. [Shea v. Wellington, 163 Mass. 369, 40 N. E. 173.] Such a failure might make the plaintiff answerable to its men, but even if its conduct be called want of ordinary care, it was induced, as we must assume after the verdict, by the warranty or representations of the defendants. The very purpose of the warranty was that the boiler should be used in the plaintiff's works *with reliance upon the defendants' judgment in a matter as to which the defendants were experts and the plaintiff presumably was not.* Whether the false warranty be called a tort or a breach of contract the consequences which ensued must be taken to have been contemplated and was not too remote." (Italics ours).

In this case there was no express warranty. But can it be said that the parties here are *in pari delicto?* The plaintiff's negligence, for which its employees had a right to recover, was a failure to inspect the scaffold and be sure it was safe. Since the plaintiff's president, Mr. Latta, conducting the business, was not an expert

engineer, his negligence, so far as the injured employees are concerned, was in failure to have an expert examine the structure and determine whether it was safe. The defendant's negligence was in manufacturing and furnishing for a specific purpose a structure which was unfit when defendant was bound to know whether it was suitable for such purpose. Where an article is manufactured and sold for a definite purpose, there is an implied warranty that it is suitable for the purpose. [35 Cyc. 401.]

The defendant, as stated above, argues that that rule does not apply here because the plaintiff was furnished with the definite and specific article which it ordered. The evidence shows that Mr. Latta did not rely upon his own judgment as to the quality and fitness of the scaffold, but relied upon the expert knowledge of the defendant in furnishing a structure suitable for the purpose. At least the evidence was sufficient from which the jury could properly find that fact.

It follows that the defendant in this case was primarily liable for injuries caused by the defects in the scaffold. [31 C. J. 449; 14 R. C. L. p. 10; 24 R. C. L. 192.] As said by the court in the Kendall case, supra (178 Mass. l. c. 237): "The fact that the reliance was not justified as toward the men does not do away with the fact that the defendants invited it with notice of what might be the consequences if it should be misplaced."

So, here, the plaintiff, so far as its employees were concerned, was not justified in relying upon the skill and good faith of the defendant, does not neutralize the fact that defendant invited that reliance by furnishing a structure which in effect it assured the plaintiff would answer the purpose.

Suppose the plaintiff had suffered an injury or damage directly by the collapse of the scaffold. Could the defendant have successfully defended the suit on the ground that the plaintiff was negligent in failing to inspect the scaffold or the plan before using it? On the ground that the plaintiff was negligent in trusting the

defendant? We know no law which would support that theory. If the plaintiff had gone to trial in defense of the suit by its employees for their injuries caused by the collapse of the scaffold, its only defense under the circumstances must have been that it used all the care the law required of it in providing a safe place for the men to work, and the question would have been whether by trusting to the defendant it had used such care. This is a case where the defendant was, or held itself out to be, a builder of scaffolds with expert scientific skill, and undertook to build a scaffold suitable for the purpose for which plaintiff wanted it. It was a manufacturer of an article for a definite, specific purpose, and the undertaking to manufacture the article for the purpose carried with it a warranty that it was suitable for the purpose. While the defendant furnished a sketch showing the definite plan by which the structure was to be constructed and plaintiff saw it, there is no evidence that the plaintiff's officer inspected it with an understanding of its quality. On the contrary, the evidence tends to show that Mr. Latta took Mr. Martin's judgment on its fitness. We fail to find a reason on the ground of joint tortfeasors for sustaining the demurrer to the evidence.

Appellant points to Section 6802, Revised Statutes 1919, which requires that all scaffolds or structures used for the erection, repairing of buildings, etc., shall be so secure as "to insure the safety of persons working thereon." The failure to comply with that section is made a misdemeanor by Section 6806. Appellant argues that it is against the policy of the law to allow a tortfeasor indemnity when the tort committed by him is contrary to the statute and constitutes a misdemeanor. Of course that statute applies to the defendant, as well as to the plaintiff. It does not put them *in pari delicto;* so far as their relations to each other are concerned it leaves them where they were before. The defendant violated that statute when it undertook, with its scientific and expert knowledge, to comply with it. The plaintiff was ignorant of what was necessary, but in good faith thought

the statute was being complied with and trusted the defendant to meet the requirements. Appellant has cited no authority in support of its position that this would release the defendant from liability to indemnify the plaintiff.

V. Error is assigned to the modification of defendant's Instruction 4. This instruction as offered by the defendant told the jury that if the scaffold was erected in accordance with certain drawings and that the said drawings did not call for use of bolts but did call for nails, *Instruction.* and the defendant in constructing the scaffold used nails of the size specified or larger, then the defendant discharged its duty toward the plaintiff. The court modified that instruction by inserting the words: "which drawings plaintiff was familiar with and understood." Certainly that was a necessary element in the instruction before the plaintiff could be denied recovery. The plaintiff's acceptance of the plans presented did not conclude it as receiving what it bargained for unless it understood what the drawings meant, or unless it understood the quality of the thing represented by the drawing.

VI. Error is assigned to the admission of the testimony of Mr. Paffrath who said that in his opinion the scaffold as constructed and fastened together with nails was not reasonably safe for the purpose for which it was built. He testified that he was a civil engineer and building *Expert Testimony.* superintendent, and had been engaged in that business for more than twenty years. We think he was qualified as an expert to testify on that point. The point made is that the evidence invades the province of the jury; that it was the duty of the jury to determine whether or not the structure was safe, and to allow the witness to give his opinion upon it was to usurp the function of the jury. Cases such as Eubank v. City of Edina, 88 Mo. l. c. 655, are cited in support of the position. In that case witnesses were

asked whether a sidewalk was in reasonably safe condition for travel. The court held the question improper. The evidence sought to be elicited was that of non-expert witnesses and it applied to a matter of which the jury was as capable of judging as the witness. Whether testimony of that kind is given by expert or non-expert witnesses, it is not competent if it asks the judgment of the witnesses upon a condition which did not require expert knowledge to understand. Plainly, one who walks upon a sidewalk can tell as well as another whether it is safe for travel if the defect is open to observation. There is nothing in it which requires expert knowledge to ascertain. Cases of that kind are not in point. Another line of cases cited by the appellant are Taylor v. Railroad, 185 Mo. 249; Roscoe v. St. Ry. Co., 202 Mo. 576. In those cases hypothetical questions to an expert witness are held to be incompetent where the opinion of the witness is asked regarding a conclusion which must be determined by the jury. That line of cases has been disapproved by this court in case of O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55. In that case a physician, as an expert, was permitted to say that in his opinion the injury to plaintiff caused an infection which aggravated the injury. This was claimed to be error and the line of cases mentioned above were cited in support of the claim. This court held that the question was proper and disproved those earlier cases. It was held that, while it was a question for the jury to decide, it was proper to offer opinion evidence upon an exact point. Judge James T. Blair, discussing the matter, said, at page 375:

"No doubt a question put to an expert could be so framed as to call for an answer as to whether the accident alleged actually happened. Such a question should not be permitted. *It would not invade the jury's province;* but it would be an opinion outside the expert's field of science, and such opinions are not competent. The jury's duty to decide that question should not be 'usurped' by a witness nor its 'province invaded.' A witness would

remain a witness and the jury would remain the jury. Nevertheless, the opinion would not be competent as an expert opinion for the reason that the expert would not be an expert on that question and his opinion would be no more competent than that of any other person.''

The effect of that exposition is that the opinion evidence of experts is not halted by the approach of the testimony to the ultimate fact to be decided. It is limited only by the field of the expert's knowledge. And from that case we may deduce the rule that a physician, in testifying as an expert upon the effect of an injury, may state whether or not in his opinion the injury caused the death or disease or result which forms the basis of the suit. The case is well considered and cites many cases, including several from this State, in support of the position, and among them Wood v. Railway, 181 Mo. 433, also a case which considered the subject at length. It is a universal rule that a medical expert may give his opinion as to the cause of a death, notwithstanding that is an issue which must be ultimately determined by the jury. In a murder case that is an ultimate fact to be proven.

In the present case the expert was asked if the structure, the plans of which he examined, was reasonably safe for the purpose. Manifestly a non-expert would not know, no matter how minutely the structure should be described, and the jury would not be able to tell, whether it was suitable for the purpose or safe, except as a mere guess. In the absence of evidence they would have no definite knowledge on the subject. The ultimate fact to be proven which the jury must determine was whether the unsafe quality of the structure caused it to fall, or whether it was caused to fall by plaintiff's improper handling. They did pass upon that question. If the engineer had examined the debris after the collapse, under the ruling in the O'Leary case, it would have been entirely proper for him to say that in his opinion the use of nails in fastening the timbers was the cause of the collapse, which would carry the con-

clusion one step further than the question actually asked. When it is said that it is the province of the jury to pass upon certain ultimate facts, that does not distinguish, because the jury must pass upon *all* the facts presented for consideration. Every incidental and circumstantial fact tending to establish ultimate liability is a fact which the jury must weigh and consider, and it is in their province to do so. They may be aided by expert testimony in the matters which require expert knowledge and expert exposition. When an expert testifies that in his opinion a certain cause produced a certain result, it is like any other fact of which the jury has evidence; they may believe it or disbelieve it as they see fit. The defendant introduced evidence of experts who swore that the structure was reasonably safe, and the jury had a choice as to which they would believe. The evidence was properly admitted.

VII. The appellant claims that the damage authorized by the instruction was excessive because the greater part of the money paid to the injured employees on behalf of the plaintiff was not in fact paid by the plaintiff but by the Travelers' Insurance Company. That company paid Karl $1000, and Ellrich $5000, so that the plaintiff actually paid only $500 in discharge of those claims, therefore the plaintiff has no right of indemnity for money it did not pay out. The rule is that the insurer in a case like this has a right to be subrogated *pro tanto* to the right of action which the insured had against the party whose wrongful act caused the loss. [14 R. C. L. p. 1404; Swift & Co. v. Railroad, 149 Mo. App. 526; Norwich Ins. Co. v. Standard Oil Co., 59 Fed. 987; Travelers' Ins. Co. v. Engineering Co., 184 Fed. 426.]

Here the Travelers' Insurance Company insured the plaintiff against losses such as this. The Travelers' Insurance Company was obliged to pay to plaintiff any losses which the plaintiff incurred. But the insurance company had a right to subrogation against any person

liable to plaintiff on account of the loss. Whatever the plaintiff recovers in this case belongs as of right to the Travelers' Insurance Company, and in such case, as the authorities show, the suit for recovery must be brought in the name of the plaintiff. The defendant has cited no case in conflict with this holding.

It is further claimed that plaintiff had no right to recover for the $979 paid to the Merchants' Exchange for damage to the building, on the theory that there was no proof that the plaintiff was liable for any such damage. The plaintiff, without objection, introduced evidence to show the actual damage to the building caused by the collapse of the scaffold with an itemized statement that the damage amounted to $979, the amount sued for. There was no evidence to the contrary, and no objection to that method of showing the damage which the plaintiff was compelled to pay to the Merchants' Exchange on account of the collapse.

The jury improperly was authorized, if it found for plaintiff, to include attorney's fees claimed to have been paid by the plaintiff and for services rendered in defense of the suits brought by Ellrich and Karl.

The case was well tried by defendant's counsel who, with wonderful ingenuity, plausibility and force presented the several points discussed. While some of the questions have been difficult of solution, the record and the authorities compel us to reach the conclusion we have in the matter.

There was no evidence in the case as to the value of attorney's fees. The amount for which the jury should have returned the verdict was the $6500 paid to the men and the $979 paid to the Merchants' Exchange, a total of $7479. The verdict and judgment were for the sum of $7879, an excess of $400. If, therefore, the plaintiff shall within ten days remit $400, the judgment will be affirmed for $7479; otherwise, the judgment will be reversed and the cause remanded.

All concur.